Compl. Ex. A

 

February 26, 2025

Filed in Paper via Certified Mail and Electronically Via Secure Release

Senior Director of FOIA Operations
Privacy Office, Mail Stop 0655
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, DC 20598-0655

Privacy Office, Mail Stop 0655
Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0655

ICE Privacy Office
Immigration & Customs Enforcement
500 12th St., SW Stop 5004
Washington, DC 20536-5004

U.S. Customs & Border Patrol
1300 Pennsylvania Avenue NW, Mail Stop 1181
Washington, D.C. 20229

Re:    Freedom of Information Act Request on Mass Influx Agreements

Dear FOIA Officer:

The American Immigration Council (the "Council") and Documented (together, "Requesters") submit this request to the U.S. Department for Homeland Security ("DHS"), U.S. Customs and Border Patrol ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for certain records relating the DHS's Secretary's "Finding of Mass Influx of Aliens" dated January 23, 2025, and certain agreements with state and local governments, including those executed pursuant to 8 U.S.C. § 1103(a)(10), Immigration and Nationality Act ("INA") § 103(a)(10), and its implementing regulations, 28 C.F.R. § 65.80 *et seq*. Requesters also seek expedited processing and a fee waiver.

## I.    REQUEST FOR INFORMATION

Requesters seek the following records prepared, received, transmitted, collected or maintained by DHS, CBP, and ICE as described below:

A.    Records[1] read, reviewed, or otherwise considered by the DHS Secretary, his supervisees, or his delegees when making the "Finding of Mass Influx of Aliens" dated January 23, 2025, *see* Ex. A, including those considered when making the following findings:

1.    An "actual or imminent mass influx of aliens is arriving at the southern border of the United States," *id.* at 4;

2.    The 60-day time period for that influx, *id.*;

3.    The influx's "geographic boundaries" as the "entire southern border," *id.* at 3;

4.    The presence of "urgent circumstances requiring an immediate federal response," *id.* at 4;

5.    The existence of "circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents" in each of the fifty States, including Alaska and Hawaii, *id.*;

6.    The existence of "millions" of "gotaways" "over the last four years," *id.* at 2;

7.    That "the introduction of unvetted foreign persons … has a likelihood to increase criminal activity," *id.* at 3;

8.    That "[m]uch of the illegal entries at our southern border involve other criminal conduct, including human trafficking, drug smuggling, and sexual assault," *id.* at 3

B.    All agreements, memoranda of understanding, and other similar records[2] ever executed by the DHS Secretary, the Attorney General, their past and present supervisees,[3] or their past and present delegees with a State or local government pursuant to 8 U.S.C. § 1103(a)(10), INA § 103(a)(10), or its implementing regulations (hereinafter "103(a)(10) agreements") through the date the agency completes a reasonable search;

---

[1] The term "records" for I.A includes, but is not limited to, all communications, correspondence, directives, documents, data, videotapes, audiotapes, e-mails, faxes, files, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, spreadsheets, charts, rules, manuals, technical specifications, training materials, and studies, including records kept in written form, or electronic format on computers and/or other electronic storage devices, electronic communications, including text messages, and/or videotapes, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

[2] These records include both contingency and non-contingency agreements. Responsive contingency agreements include, but are not limited to, the memorandum of understanding executed between Florida Governor Lawton Chiles and Immigration & Naturalization Service (INS) Commissioner Doris Meissner in October 1998, *see* Ex. B, the "companion agreement" to that memorandum, *id.*, and the "[p]reliminary contingency agreements" between INS and Florida state or local law enforcement agencies referenced in Powers of the Attorney General to Authorize State or Local Law Enforcement Officers to Exercise Federal Immigration Authority During a Mass Influx of Aliens, 67 Fed. Reg. 48,354, 48,355 (July 24, 2002).

[3] Supervisees include, but are not limited to, the Commissioner for U.S. Customs and Border Patrol, the Director of U.S. Immigration and Customs Enforcement, and the Commissioner for the Immigration and Naturalization Service.

C.   All agreements, memoranda of understanding, and other similar records ever executed by the DHS Secretary, her past and present supervisees,[4] or her past and present delegees with Nassau County between January 20, 2025, and the date the agency completes a reasonable search; and

D.   DHS Delegation 7010.3, Delegation of Authority to the Commissioner of CBP.

## II.    FORMAT OF PRODUCTION

Requesters seek responsive electronic records in a machine-readable, native file format, with all metadata and load files. Requesters ask DHS, ICE, and CBP to produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits, in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

## III.    EXPEDITED PROCESSING

Requesters seek expedited processing of this request and certify that the statements herein are "true and correct" pursuant to 6 C.F.R. § 5.5(e)(3). FOIA obligates DHS, ICE, and CBP to process two types of requests expeditiously: (i) those where a requester "demonstrates a compelling need"—such as "urgency to inform the public concerning actual or alleged Federal Government activity" if the requester is "primarily engaged in disseminating information"—5 U.S.C. § 552(a)(6)(E)(i), (v); and (ii) "in other cases determined by the agency." *Id.* § 552(a)(6)(E)(i), which, for DHS, include "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 6 C.F.R. § 5.5(e)(ii)-(iv). Both types of cases exist here.

### *A Matter of Widespread and Exceptional Interest Raising Government Integrity Concerns*

The DHS Secretary's Mass Influx Finding is a matter of widespread and exceptional media interest in which possible doubt exists about government's integrity and affects public confidence. Only a "handful of articles" are necessary to show "widespread and exceptional media interest" in a matter where they are "published in a variety of publications" and "repeatedly reference the ongoing national discussion." *Am. Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004). Over twenty new articles from media outlets across the nation have discussed the Secretary's Finding,[5] as it is the first time that the federal

---

[4] Supervisees include, but are not limited to, the Commissioner for U.S. Customs and Border Patrol, the Director of U.S. Immigration and Customs Enforcement, and the Commissioner for the Immigration and Naturalization Service.
[5] Rebecca C. Lewis, *Nassau County Deputizes Local Cops to Act as ICE Agents*, City & State New York (Feb. 5, 2025), https://www.cityandstateny.com/policy/2025/02/nassau-county-deputizes-local-cops-act-ice-agents/402777/; Arelis R. Hernández & Silva Foster-Frau, *Texas Governor Orders National Guard to Enforce Immigration Law at Border*,

The Washington Post (Feb. 3, 2025), https://www.washingtonpost.com/immigration/2025/02/03/texas-border-patrol-immigration-trump/; David J. Bier, *What Trump Has Done And Immediately Plans to Do On Immigration*, Cato Institute (Feb. 3, 2025, 3:10 PM), https://www.cato.org/blog/what-trump-has-done-imminently-plans-do-immigration; Jack Lemnus, *The Role of Local Law Enforcement in Trump Administration Immigration Crackdown*, TCPalm (Feb. 3, 2025, 5:04 AM), https://www.tcpalm.com/story/news/state/2025/02/03/the-role-of-local-law-enforcement-in-the-trump-immigration-crackdown-mass-deportation-ice-dhs-border/78029205007/; Priscilla Alvarez, *How the Trump Administration is Building Out Its Immigration Enforcement Machine*, CNN (Feb. 2, 2025, 4:00 AM), https://www.cnn.com/2025/02/02/politics/trump-immigration-enforcement/index.html; Tierney Sneed, *How Trump Calling Immigration an Invasion Could Help Him Stretch the Law*, CNN (Jan. 31, 2025, 5:00 AM), https://www.cnn.com/2025/01/31/politics/immigration-invasion-trump/index.html; Sylvia Goodman, *Beshear Open to Evaluating Requests for State Help in Immigration Enforcement*, Louisville Public Media (Jan. 30, 2025, 3:25 PM), https://www.lpm.org/news/2025-01-30/beshear-open-to-evaluating-requests-for-state-help-in-immigration-enforcement; Fola Akinnibi, *Trump Paves the Wave to Deputize Local Police on Immigration*, Bloomberg (Jan. 30, 2025, 9:45 AM), https://www.bloomberg.com/news/articles/2025-01-30/texas-florida-prep-for-local-police-collaboration-with-ice-on-immigration; Jesssica Garrison & Rebecca Plevin, *Trumps Orders Have Upended U.S. Immigration. What Legal Routes Remain?* Los Angeles Times (Jan 30, 2025, 3:00 AM), https://www.latimes.com/california/story/2025-01-30/trump-orders-upend-immigration-what-legal-routes-remain; Julia Spencer, *Community Reacts to Local Law Enforcement Acting as Immigration Agents Following DHS Memo*, KFOX14 (Jan. 28, 2025, 10:53 PM), https://kfoxtv.com/news/local/local-law-enforcement-declines-new-immigration-enforcement-powers-federal-state-local-ice-hsi-border-trump-administration-illegal-migrant-immigrant; American Immigration Council, The "Mass Influx" Declaration (Jan. 27, 2025), https://www.americanimmigrationcouncil.org/research/mass-influx-declaration; Ana Ceballos & Syra Ortiz Blanes, *Trump Calls on States to Help with Immigration Crackdown; What It Could Mean for Florida*, Tampa Bay Times (Jan 25, 2025), https://www.tampabay.com/news/florida-politics/2025/01/25/trump-calls-states-help-with-immigration-crackdown-what-it-could-mean-florida/ (hereinafter "Ceballos & Ortiz Blanes – Tampa Bay Times"); *Trump's Immigration Enforcement Push*, Devdiscourse (Jan. 24, 2025, 1:31), https://www.devdiscourse.com/article/law-order/3238456-trumps-immigration-enforcement-push; Maria Sacchetti et al, *Trump Ramps Up ICE Arrests, Alarming Cities and Immigrant Communities*, The Washington Post (Jan. 24, 2025), https://www.washingtonpost.com/immigration/2025/01/24/immigration-raids-deportations-trump-ice/; Ana Ceballos & Syra Ortiz Blanes, *Trump Calls on States to Help With Immigration Crackdown as DeSantis Seeks Power to Deport*, Miami Herald (Jan. 24, 2025, 8:03 PM), https://www.miamiherald.com/news/local/immigration/article299100860.html (hereinafter Ceballos & Ortiz Blanes – Miami Herald); Eileen Sullivan, *Trump Officials Seek to Deputize Local and State Officials in Immigration Enforcement*, NY Times (Jan. 24, 2025), https://www.nytimes.com/live/2025/01/24/us/president-trump-news#house-oversight-committee-to-investigate-republican-complaints-about-banks; Ted Hesson & Hannah Lang, *Trump Targets Migrants in Biden Programs, Paves Way for More State and Local Help in Crackdown*, Reuters (Jan. 24, 2025, 5:07 PM), https://www.reuters.com/world/us/trump-immigration-enforcement-memo-targets-migrants-who-entered-legally-under-2025-01-24/; *The Acting Secretary of Homeland Security, Benjamine Huffman, Has Invoked a Seldom-Used Provision of Federal Law to Make it Easier to Deputize State and Local Police to Carry Out Immigration Enforcement, Reuters Reports*, The Guardian (Jan. 24, 3:54 PM), https://www.theguardian.com/us-news/live/2025/jan/24/us-politics-donald-trump-tariffs-china-birthright-citizenship-latest-news-updates?filterKeyEvents=false&page=with%3Ablock-679429e88f08d4eb8c4903e3; Ted Hesson & Hannah Lang, *Trump Targets Migrants in Biden Programs, Ramps Up Enforcement*, Start Advertiser (Jan. 24, 2025), https://www.staradvertiser.com/2025/01/24/breaking-news/trump-targets-migrants-in-biden-programs-ramps-up-enforcement/; Louis Casiano, *Trump DHS Finds 'Mass Influx' of Illegal Migrants at Southern Border, Requests Assistance From All 50 States*, Fox News (Jan. 23, 2025, 9:32 PM), https://www.foxnews.com/politics/trump-dhs-mass-influx-illegal-migrants-southern-border-requests-assistance-50-states.

government has declared a mass influx under 8 U.S.C. § 1103(a)(10) and its implementing regulation, 28 C.F.R. § 65.83.

Much of media coverage on this Finding has expressed concerns about its factual basis or legality.[6] Such concerns are well-founded as the Finding rests on at least two dubious assertions: (i) the occurrence of "an influx of aliens arriving across our entire southern border," Ex. A at 3; and (ii) the existence of "circumstances involving the administration of the immigration laws of the United States that endanger the lives, safety, or welfare of the residents of all 50 States," Ex. A at 3–4—including the non-contiguous states of Hawaii and Alaska. The claimed influx is doubtful. CBP encounters along the border are not only decreasing,[7] but also less than they were in February 2003 when the Department of Justice declared that a "mass influx" declaration "will rarely be necessary,"[8] Abbreviation or Waiver of Training for State or Local Law Enforcement Officers Authorized to Enforce Immigration Law During a Mass Influx of Aliens, 68 Fed. Reg. 8820, 8821 (Feb. 26, 2003). FY2025 encounters along the border are also on pace to fall well below those of FY1997-1998[9]—the years when 8 U.S.C. § 1103(a)(10)'s implementing regulations were drafted and published and no "mass migration event [was] imminent." Ex. B – DOJ Press Release. As for the second assertion, the rationale provided for the existence of "circumstances involving the administration of the immigration laws of the United States that endanger the lives, safety, or welfare of the residents of all 50 States," Ex. A at 3-4, is questionable. Purportedly, such circumstances arise from DHS lacking the capacity to detain and screen every noncitizen arriving unlawfully, a capacity it has never had. Under the DHS Secretary's logic, therefore, the "rare" circumstances permitting a mass influx declaration have existed continuously since Congress passed 8 U.S.C. § 1103(a)(10).

Likewise, 103(a)(10) agreements authorizing state and local jurisdictions to enforce immigration laws are also a matter of widespread and exceptional media interest where possible doubt exists about government's integrity and affects public confidence. Over thirty-five articles in local, social, and nationwide media outlets have discussed the only known 103(a)(10) agreement,

---

[6] See Hernández & Foster-Frau, supra n. 9; Bier, supra n. 9; Lemnus, supra n. 9; Alvarez, supra n. 9; Sneed, supra n. 9; Akinnibi, supra n. 9; Maria Sacchetti et al, supra n. 9; American Immigration Council, supra n. 9; Ceballos & Ortiz Blanes – Tampa Bay Times, supra n.9; Devdiscourse, supra n. 9; Maria Sacchetti et al, supra n. 9; Ceballos & Ortiz – Miami Herald, supra n. 9; Sullivan, supra n. 9.

[7] CBP encountered only 96,048 people in December 2024, the most recent government statistics available at the time of this FOIA request's filing. See U.S. Customs & Border Protection, Nation Wide Encounters (Feb. 12, 2025), https://www.cbp.gov/newsroom/stats/nationwide-encounters. That is 20,000 fewer encounters than October 2024, 84,000 fewer encounters than May 2024, and 205,000 fewer encounters than December 2023. See id.

[8] CBP encountered 821 fewer people at the southwestern border in December 2024 than in February 2003. Compare Nationwide Encounters, supra n. 8 (96,048 people), with U.S. Border Patrol, Total Illegal Alien Apprehensions by Month – FY 2003, https://tinyurl.com/646nyp38 (98,869 people).

[9] CBP encounters at the southwestern border in FY1997 and FY1998 were 1,368,707 people and 1,516,680 people respectively. See U.S. Border Patrol, U.S. Border Patrol Fiscal Year Southwest Border Sector Apprehensions (FY 1960 - FY 2020), https://www.cbp.gov/newsroom/media-resources/stats. FY2025 encounters from October-December 2024 are only 296,570, Nationwide Encounters, supra n.8—which would result in only 1, 186,280 encounters along the border in FY2025 if the pace of encounters continues.

which CBP recently executed with the Texas National Guard.[10] Several of these articles express concerns about the agreement's legality.[11] Such concerns are not unfounded. In addition to its

---

[10] Anna Giaritelli, *'Hundreds' of Texas National Guard Soldiers Stand Ready to Arrest and Deport Illegal Immigrants*, Washington Examiner (Feb. 24, 2025, 6:00 AM), https://www.washingtonexaminer.com/policy/immigration/3326093/texas-national-guard-stand-ready-arrest-deport-illegal-immigrants/; Lisely Garza, *Laredo Border Patrol Sector Welcomes Texas National Guard*, KGNS News (Feb. 19, 2025, 2:24 PM), https://www.kgns.tv/2025/02/19/laredo-border-patrol-sector-welcomes-texas-national-guard/; *Here's How And Why Texas National Guardsmen Can Now Arrest or Detain Migrants*, myRGV.com (Feb. 18, 2025), https://myrgv.com/local-news/2025/02/18/heres-how-and-why-texas-national-guardsmen-can-now-arrest-or-detain-migrants/; Alejandra Yañez et al., *New Head of Border Patrol Swears in National Guard, DPS Who Can Arrest Immigrants*, Valley Central.com (Feb. 14, 2025, 7:53 PM), https://www.valleycentral.com/news/local-news/new-head-of-border-patrol-to-swear-in-national-guard-dps-who-can-arrest-immigrants/; Valerie Gonzalez (@ValOnTheBorder), Twitter (Feb. 14, 2025, 1:52 PM), https://x.com/ValOnTheBorder/status/1890474147253207160; Carola Guerrero De León, *Hundreds of Texas National Guard Troops Deploy to Laredo Border to Help With Immigration Crackdown*, The Latin Times (Feb. 11, 2025, 4:18 PM EST), https://www.latintimes.com/hundreds-texas-national-guard-troops-deployed-laredo-border-authorized-make-deportation-arrests-575329; Jordan Elder, *Governor Abbot Pushes for Federal Reimbursement Amid New National Guard Border Duties* (Feb. 10, 2025, 3:00 PM), https://kmph.com/news/nation-world/governor-abbott-pushes-for-federal-reimbursement-amid-new-national-guard-border-duties-trump-texas-executive-order-tariffs-buoys; *The Texas National Guard Can Now Arrest & Detain Individuals Entering the U.S. Unlawfully*, CBS News Texas (Feb. 9, 2025), https://www.cbsnews.com/news/texas-national-guard-can-now-arrest-and-detain-individuals-entering-the-u-s-unlawfully/; Kelli Ballard, *Texas National Guard Authorized to Arrest Illegal Migrants*, Liberty Nation News (Feb. 9, 2025), https://www.libertynation.com/texas-national-guard-authorized-to-arrest-illegal-migrants/; Lily Celeste, *National Guard Troops Work Alongside Valley Border Patrol Agents to Arrest Migrants* (Feb. 7, 2025, 6:32 PM), https://www.krgv.com/news/national-guard-troops-work-alongside-valley-border-patrol-agents-to-arrest-migrants/; *Texas Empowers National Guard Soldiers to Arrest Asylum Seekers at U.S. Border*, DemocracyNow! (Feb. 6, 2025), https://www.democracynow.org/2025/2/6/headlines/texas_empowers_national_guard_soldiers_to_arrest_asylum_seekers_at_us_border; John C. Moritz, *Gov. Abbot Says Texas National Guard Can Now Make Immigration Arrests, Guard Can Now Make Immigration Arrests,* Yahoo!News (Feb. 5, 2025, 11:20 PM), https://www.yahoo.com/gov-abbott-says-texas-national-042054033.html; John C. Mortiz, *Gov. Abbott Says Texas National Guard Can Now Make Immigration Arrests*, AOL (Feb. 5, 2025, 11:20 PM), https://www.aol.com/gov-abbott-says-texas-national-042054033.html; John C. Mortiz, *Texas National Guard Soldiers Now Have Authority to Make Arrests at U.S.-Mexico Border*, Austin American-Statesman (Feb. 5, 2025 8:43 AM), https://www.statesman.com/story/news/politics/state/2025/02/03/immigration-texas-national-guard-us-mexico-border-soldiers-operation-lone-star/78183165007/; Matt Vasilogambros, *Blue States Fear Invasion by Red-State National Guard Troops for Deportations*, Stateline (Feb. 5, 2025, 5:00 AM), https://stateline.org/2025/02/05/blue-states-fear-invasion-by-red-state-national-guard-troops-for-deportations/; Ashleigh Fields, *Abbot Says Texas National Guard Now Authorized to Make Immigration Arrests*, The Hill (Feb. 4, 2025, 11:22 AM), https://thehill.com/homenews/state-watch/5125341-greg-abbott-texas-national-guard-migrant-arrests/; Jack Fink, *Abbot Explains Why He Agreed to Expand the Texas National Guard's Role on Immigration*, CBS News Texas (Feb. 4, 2025, 8:10 AM), https://www.cbsnews.com/texas/news/texas-national-guard-arrest-migrants-new-agreement/; Gabriella Alcorta-Solorio, *Texas National Guard Soldiers Can Now Make Immigration Arrests at the Border*, Houston Public Media (Feb. 4, 2025, 7:02 AM), https://www.houstonpublicmedia.org/articles/news/border/2025/02/04/512823/texas-national-guard-soldiers-can-now-make-immigration-arrests-at-the-border/; Kimberly Hayek, *Texas National Guard Deputized to Make Immigration Arrests at Southern Border*, NTD (Feb. 4, 2025), https://www.ntd.com/texas-national-guard-deputized-to-make-immigration-arrests-at-southern-border_1045229.html; Ethan Buchanan, *Texas National Guardsmen Can*

dubious mass influx premise, the agreement authorizes the Texas National Guard to exercise and perform unspecified authorities, duties, powers, and privileges of immigration officers without satisfying "any applicable training requirement." Ex. C – Texas National Guard Agreement § V(d)-(e).

### Urgency to Inform the Public about Federal Government Activity by a Requester

Additionally, and alternatively, Requesters have a compelling need for the records sought. They are primarily engaged with disseminating information. And urgency also exists to inform the

---

*Now Arrest Illegal Aliens*, KTRH Local Houston & Texas News (Feb. 4, 2025), https://ktrh.iheart.com/featured/houston-texas-news/content/2025-02-03-texas-national-guardsmen-can-now-arrest-illegal-aliens/; Matt Stringer, *Texas National Guard, State Law Enforcement Granted Federal Immigration Enforcement Authority*, The Texan (Feb. 4, 2025), https://thetexan.news/issues/immigration-border-issues/texas-national-guard-state-law-enforcement-granted-federal-immigration-enforcement-authority/article_5986392a-e310-11ef-85ef-efb623ebc07d.html; Aaron Torres, *Agreement Allows Texas Soldiers to Arrest Undocumented Migrants*, Longview News-Journal (Feb. 4, 2025), https://www.news-journal.com/news/state/agreement-allows-texas-soldiers-to-arrest-undocumented-migrants/article_9c9c3cd6-e2a3-11ef-9996-77943ca076cb.html; Nadia Lathan, *Texas National Guard Can Now Arrest & Detain People Who Illegally Enter the United States*, News 10 (Feb. 3, 2025, 7:19 PM), https://www.whec.com/national-world/texas-national-guard-can-now-arrest-and-detain-people-who-illegally-enter-the-us/; Anders Hagstrom, *Texas National Guard Deputized to Make Immigration Arrests*, Fox News (Feb. 3, 2025, 6:39 AM), https://www.foxnews.com/politics/texas-national-guard-deputized-make-immigration-arrests; *Texas National Guard to Make Immigration Arrests Under Agreement with Trump* Administration, ABC 8 (Feb. 3, 2025), https://www.wfaa.com/video/news/local/border-crisis/texas-national-guard-to-make-immigration-arrests-under-agreement-with-trump-administration/287-a58835b8-e023-4e6f-be83-78c6f3105831; Alejandro Serrano, *Texas National Guard to Make Immigration Arrests Under Agreement with Trump Administration*, The Texas Tribune (Feb. 3, 5:00 PM), https://www.texastribune.org/2025/02/03/texas-national-guard-immigration-arrests/ (hereinafter "Serrano – Texas Tribune"); Amelia Jones & Adam Fullerton, *Texas National Guard Troops Allowed to Make Immigration Arrests*, Fox 4 (Feb. 3, 2025, 3:22 PM), https://www.fox4news.com/news/texas-national-guard-immigration-arrests; Jason Hopkins, *Texas National Guard Granted Immigration Arrest Authority Under Agreement with Trump Admin*, Daily Caller (Feb. 3, 2025, 2:47 PM), https://dailycaller.com/2025/02/03/texas-national-guard-to-arrest-migrants/; Lauren Bly & Nicole Ardila, *Texas National Guard to Make Immigration Arrests* (Feb. 3, 2025, 10:52 AM), https://kvia.com/politics/2025/02/03/texas-national-guard-to-make-immigration-arrests/; Charlotte Hazard, *Texas Gov Abbot Says State National Guard Now Has Authority to Make Immigration Arrests*, Just the News (Feb. 3, 2025, 9:16 AM), https://justthenews.com/government/security/gov-abbott-announces-texas-national-guard-now-has-authority-make-immigration; Billal Rahman, *Greg Abbot Gives Texas National Guard Sweeping New Powers*, Newsweek (Feb. 03, 2025, 7:19 AM), https://www.newsweek.com/greg-abott-texas-national-guard-immigration-arrest-2025059; Alejandro Serano, *Texas Guard Can Make Immigration Arrests Under New Trump Agreement*, Military Times (Feb. 3, 2025), https://www.militarytimes.com/news/your-military/2025/02/03/texas-guard-can-now-make-immigration-arrests-under-trump-agreement/; Craig Nigrelli, *Texas National Guard Can Now Make Arrests in Federal Immigration Crackdown*, Straight Arrow News (Feb. 3, 2025), https://san.com/cc/texas-national-guard-can-now-make-arrests-in-federal-immigration-crackdown/; *Texas National Guard Strikes Deal with Trump to Make Immigration Arrests*, Dallas Express (Feb. 3, 2025), https://dallasexpress.com/state/texas-national-guard-strikes-deal-with-trump-to-make-immigration-arrests/ (hereinafter "Dallas Express"); Hernández & Foster-Frau, *supra* n. 9; Rebecca Falconer, *Texas National Guard to Make Immigration Arrests Under Trump Admin Deal*, Axios (Feb. 2, 2025), https://www.axios.com/2025/02/03/texas-national-guard-arrest-authority-trump-immigration.

[11] *See* De León, *supra* n. 12; Jones & Fullerton, *supra* n. 12; Hernández & Foster-Frau, *supra* n. 9; Alcorta-Solorio, *supra* n. 9; Serrano – Texas Tribune, *supra* n. 12; Serrano – Military Times, *supra* n. 12; Hayek, *supra* n. 12; Dallas Express, *supra* n. 12.

public about the DHS Secretary's Mass Influx Finding and 103(a)(10) agreements with state and local law enforcement officials.

The Council and Documented both primarily engage in disseminating information and analysis on immigration issues. Organizations primarily engaged in information dissemination include not only "media organizations and newspapers" like Documented, *Heritage Found. v. Entl. Prot. Agency*, Civil Action No. 23-748, 2023 WL 2954418, *3 (D.D.C. 2023), but also "non-partisan law and public policy group[s]" like the Council that "regularly write[], publish[], and disseminat[e], information online," *Brennan Ctr. for Just. v. Dep't of Comm.*, 498 F. Supp. 3d 87, 98 (D.D.C. 2020) (Brennan Center); *see also Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019) (Center for Public Integrity); *Protect Dem. Proj. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (Protect Democracy Project); *Am. Civil Liberties Union*, 321 F. Supp. 2d at 29 n.5 (Electronic Privacy Information Center ("EPIC")).

Like Brennan Center, Project Democracy Project, EPIC, and Center for Public Integrity, the Council authors factsheets and special reports on proposed and actual immigration policies, some of which shape media coverage in outlets across the nation.[12] It also analyzes immigration

---

[12] For instance, dozens of media outlets have quoted or referenced the Council's special report on mass deportations since its release in October 2024. *See, e.g.,* Diccon Hyatt, *These Industries Could Lose the Most Workers to Deportation*, Investopedia (Feb. 6, 2025, 4:23 PM), https://www.investopedia.com/these-industries-will-lose-the-most-workers-to-trump-deportation-plan-8782504; Natalie Bencivenga, *Facts Over Fear: Donald Trump's Promises of Mass Deportation*, Pennsylvania Capital-Star (Jan. 23, 2025, 4:00 PM), https://penncapital-star.com/commentary/facts-over-fear-donald-trumps-promises/; Billal Rahman, *California Braces for Donald Trump's Immigration Crackdown*, Newsweek (Jan. 23, 2025, 9:26 AM), https://www.newsweek.com/california-braces-donald-trump-immigration-crackdown-2019525; Daniella Silva, *How Quickly Trump Will Be Able to Carry Out His Mass Deportation Plan Depends on These Factors*, NBC News (Jan. 19, 2025, 7:00 AM), https://www.nbcnews.com/news/us-news/quickly-trump-will-able-carry-mass-deportation-plan-depends-factors-rcna188064; Ruth Murai, *New Reports: Trump's Mass Deportation Raids Will Begin Next Week*, Mother Jones (Jan 18, 2025), https://www.motherjones.com/politics/2025/01/trump-mass-deporation-chicago-immigration-inauguration/; Christopher A. Kerosky, *The Reality & Myths of Mass Deportations*, La Prensa Sonoma (Jan. 17, 2025), https://www.laprensasonoma.com/articulo/article/power-panic-mass-deportations-immigration/; Ali Velshi, *Ahead of Trump's Second Term, Mixed-Status Families Brace for the Worst*, MSNBC (Jan. 14, 2025, 1:20 PM), https://www.msnbc.com/top-stories/latest/trump-immigration-mixed-status-family-separation-rcna187446; Talia Blake, *Trump's Mass Deportation Plans Could be a Major Blow to Florida's Economy*, Central Florida Public Media (Jan. 8, 2025, 11:51 AM), https://www.cfpublic.org/economy/2025-01-08/trumps-mass-deportation-plans-could-be-major-blow-floridas-economy; Wendy Fry, *'What's Going to Happen to My Kids': California Prepares to Resist Trump Deportations*, CAL Matters (Nov. 25, 2024), https://calmatters.org/california-divide/2024/11/immigrant-deportation-california-trump/; Didi Martinez, *Trump's Mass Deportations Could Split 4 Million Mixed-Status Families. How One Is Getting Ready*, NBC News (Nov. 22, 2024, 10:08 PM), https://www.nbcnews.com/news/trumps-mass-deportations-split-4-million-mixed-status-families-one-get-rcna181318; Alexandra Hutzler, *Trump Confirms Plans to Declare National Emergency, Use Military for Mass* Deportations, ABC News (Nov. 18, 2024, 2:48 PM), https://abcnews.go.com/Politics/trump-confirms-plan-declare-national-emergency-military-mass/story?id=115963448; Diego Mendoza, *Businesses Brace for Potential Impact of Trump's Mass Deportation Plans*, Semafor (Nov. 18, 2024, 1:06 PM), https://www.semafor.com/article/11/18/2024/what-donald-trump-mass-deportations-plan-means-for-the-us-economy; Dana Gentry, *Nevada Unprepared for Trump's Mass Deportations*,

data and other government records—including those obtained through FOIA requests like this one—in interactive web reports.[13] And it circulates its reports and factsheets through its website,[14] blog, email newsletters, and a Twitter account with 64.9 thousand followers. It intends to use records obtained from this request to update a factsheet[15] that it has already published about the DHS Secretary's Mass Influx Finding and otherwise disseminate information to its readers and the larger public about this novel finding, the basis for it, and the agreements being executed pursuant to it.

Urgency also exists to inform the public about the DHS Secretary's Mass Influx Finding and the 103(a)(10) agreements executed pursuant to it. Requisite urgency exists where "the request touches on 'a matter of current exigency to the American public'" and delay "compromises a significant recognized interest." *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (quoting *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001)). DHS's Secretary's Finding and associated 103(a)(10) agreements are exigent to the American public, as demonstrated by the fifty plus articles referenced in this request. *See id.* ("[W]idespread media attention … is strong evidence of an 'urgency to inform' the public."); 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful to establishing the requirement that there be an 'urgency to inform' the public on the topic.").

Delayed production of records on the DHS Secretary's Finding and associated 103(a)(10) agreements would compromise the ongoing public debate about their legality. *Cf. Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (expediting a request for records about a possible unlawful airstrike on Syria); *Am. Civil Liberties Union of N. Cal. v. U.S. Dep't of Def.*, No. C. 06-01698, 2006 WL 1469418, at *6-7 (N.D. Cal. May 25, 2006) (expediting a request for records about possible

---

Nevada Current (Nov. 15, 2024, 5:00 AM), https://nevadacurrent.com/2024/11/15/nevada-unprepared-for-trumps-mass-deportations/; Kevin Williams, *What Trump's Mass Deportation Plan Would Mean for Immigrant Workers & the Economy*, CNBC (Nov. 11, 2024, 7:34 AM), https://www.cnbc.com/2024/11/10/trumps-mass-deportation-plan-immigrant-workers-and-economy.html; Ariana Figueroa, *Immigration Groups Brace for a Second Trump Administration*, Maryland Matters (Nov. 10, 2024, 10:01 PM), https://marylandmatters.org/2024/11/10/repub/immigration-groups-brace-for-a-second-trump-administration/; Catherine E. Shoichet, *Trump's Mass Deportation Plans Would be Costly. Here's Why*, CNN (Nov. 7, 2024, 3:08 PM), https://www.cnn.com/2024/10/19/politics/trump-mass-deportation-cost-cec/index.html; Mary Alice Parks, *Donald Trump Wants a Mass Deportation Program. How Much Could It Cost?*, ABC 7 (Nov. 1, 2024), https://abc7.com/donald-trump-wants-mass-deportation-program-how-could-cost/15495837/; David Martin Davies, *Texas Matters: Trump's Mass Deportation Plan*, Texas Public Radio (Nov. 1, 2024, 2:12 PM), https://www.tpr.org/podcast/texas-matters/2024-11-01/texas-matters-trumps-mass-deportation-plan.

[13] *See* Am. Immigr. Council, Torrance County Detention Facility: Troubling Role in Detaining Haitian Migrants During the 2021 Del Rio Incident (2024), https://www.americanimmigrationcouncil.org/foia/torrance-detention-facility; Am. Immigr. Council, Ohio, We Have a Problem: Border Patrol & Local Law Enforcement's Patterns & Tactics of Abuse in Ohio's Immigration Enforcement (2024), https://www.americanimmigrationcouncil.org/foia/ohio-border-patrol-abuse; Am. Immigr. Council, Refugee Resettlement in U.S. Cities (2019), https://data.americanimmigrationcouncil.org/en/refugee-resettlement-us/#exploratory_tool

[14] The Council's website received 4,506,460 views from 2,952,034 different users in 2024.

[15] *See* Am. Immigr. Council, The "Mass Influx" Declaration (Jan. 27, 2025), https://www.americanimmigrationcouncil.org/research/mass-influx-declaration.

unlawful military surveillance of protestors). Delayed production would also mar the debate about the accuracy of the claims underlying the mass influx. *Cf. Freedom Coalition of Doctors for Choice v. Ctrs. For Disease Control & Prevention*, 2:23-cv-102, 2024 WL 69084, at *14 (N.D. Tex. Jan. 5, 2024) (expediting a request disputing the effectiveness of COVID-19 vaccines); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 360 (D.D.C. 2020) (finding a plausible claim for expedition based on the agency misrepresenting the Mueller Report's conclusions to the public).

## IV.    FEE WAIVER REQUEST

Requestors seek a fee waiver since "disclosure of the requested records is in the public interest." 5 U.S.C. § 552(a)(4)(A)(iii). Disclosure is in the public interest where it (A) "is likely to contribute significantly to public understanding of the operations or activities of the government" and (B) "is not primarily in the commercial interest of the [R]equesters." *Id.*; *see also* 6 C.F.R. § 5.11(k)(1). Requesters satisfy both these requirements.

### A.    *Disclosure of the Information Is in the Public Interest*

Disclosing the requested records is likely to contribute significantly to the public's understanding of the DHS Secretary's Mass Influx Finding and the Department's execution and implementation of 103(a)(10) agreements with state and local law enforcement agencies. DHS, CBP, and ICE must consider four factors when assessing disclosure's contribution to public understanding of a government activity or operation, *see* 6 C.F.R. § 5.11(k)(2): (i) whether the request has a "direct and clear" rather than "remote or attenuated" connection to "identifiable operations or activities of the federal government"; (ii) whether disclosure is "meaningfully informative about government operations or activities"; (iii) whether disclosure "contribute[s] to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester"; and (iv) whether disclosure enhances "[t]he public's understanding of the subject in question … to a significant extent." *Id.* § 5.11(k)(2)(i)-(iv). Each factor supports a fee waiver here.

First, this request has a direct and clear relation to the following governmental operations and activities: (i) the DHS's Secretary "Finding of Mass Influx of Aliens" dated January 23, 2025—the first time that a presidential administration has ever invoked 8 U.S.C. § 1103(a)(10) and its implementing regulation, 28 C.F.R. § 65.83; and (ii) 103(a)(10) agreements that DHS, ICE, and CBP have executed with a state and local governments.

Second, disclosing the records sought will "be meaningfully informative" about the above activities since the information requested does not exist already in the public domain. Existing media coverage and agency press releases have only featured the DHS Secretary's Finding and the execution of several agreements. Coverage has not extended to the Finding's basis or the materials the Secretary considered when making it. Nor has media coverage touched on the terms of 103(a)(10) agreements, the statutory authority for agreements, or the exact authorities,

duties, powers, and privileges of an immigration officer that the agreements permit local or state officials to perform.

Third, disclosing the requested records will contribute to the understanding of a reasonably broad audience of persons interested in the DHS Secretary's Mass Influx Finding and the agreements that DHS, CBP, and ICE are executing with state and local law enforcement agencies. Requesters presumably satisfy this factor, as representatives of the news media. 6 C.F.R. § 5.11(k)(2)(iii). Both Documented and the Council "gather[] information of potential interest to a segment of the public, use[] [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience." *Id.* § 5.11(b)(6); *cf. Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282, 287-88 (D. Conn. 2012) (finding that ACLU is a news media representative); *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding that EPIC is a news media representative). In the alternative, the continuous and extensive media coverage about the Secretary's mass influx finding and the agreements that DHS, CBP, and ICE are executing with state and local law enforcement agencies demonstrates that a broad audience of persons are interested in these issues. And Requesters are experts in educating the public about immigration issues, intended to convey the information they receive from this request to the public, and have a demonstrated ability to do.

Fourth and finally, the request will significantly enhance public understanding DHS Secretary's Mass Influx Finding and the agreements that DHS, CBP, and ICE are executing with state and local law enforcement agencies.

> B.      *Requesters' Lack of Commercial Interest*

Turning to commercial interest, disclosure is not primarily in Requesters' commercial interest. As nonprofit and news media representatives, Requesters have no commercial interest in the records requested. See *Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 84 (D.D.C. 2021) ("[N]onprofit organizations by definition have no commercial interests."); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 406 (D.D.C. 2015) (finding that the Council has no such interest in its record requests); 6 C.F.R. § 5.11(k)(3)(ii) ("Components ordinarily shall presume that where a news media requester has satisfied the public interest standard, the public interest will be the interest primarily served by disclosure to that requester."). Rather, the request furthers Requesters' work to increase public understanding of immigration processes, including the DHS Secretary's Mass Influx Finding and agreements executed pursuant to that Finding.

***

Thank you for your attention to this request. If you have any questions regarding this request, please do not hesitate to contact us.

11

Very truly yours,

/s/ Chris Opila                    /s/ Max Siegelbaum

Christopher ("Chris") Opila        Max Siegelbaum
Staff Attorney (Transparency)      Special Projects and Investigations Editor
American Immigration Council       Documented
PMB2026                            85 Broad Street, Suite 1201
2001 L Street N.W., Suite 500      New York, NY 10004
Washington, DC 20036               917-453-5758 | max.siegelbaum@documentedny.com
202-507-7699 | copila@immcouncil.org

Exhibit A

**FINDING OF MASS INFLUX OF ALIENS**

On January 20, 2025, the President issued Presidential Proclamation, *Guaranteeing the States Protection Against Invasion*. That Presidential Proclamation recognizes an "ongoing influx of illegal aliens across the southern border of the United States." *Id.* In support of that, the order notes that "[o]ver the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States." *Id.*

Section 65.83 of Title 28 of the Code of Federal Regulations allows the Secretary[1] to "request assistance from a State or local government in the administration of the immigration laws of the United States" under certain specified circumstances. Among those circumstances are when "[t]he [Secretary] determines that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality." 28 CFR § 65.83(b).

In making such a determination, the Secretary may also determine that "an actual or imminent mass influx of aliens [are] arriving off the coast or near a land border of the United States and . present[] urgent circumstances requiring an immediate federal response." 28 CFR § 65.83(d)(1) (using identical language as 8 U.S.C. § 1103(a)(10)). Such a determination is based on "the factors set forth in the definitions contained in" 28 CFR § 65.81.

I have determined that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the

---

[1] Although the regulations reference the "Attorney General," Congress has, since the publication of these regulations, transferred the authority and responsibility for administering and enforcing the immigration laws to the Secretary of Homeland Security. *See* Homeland Security Act of 2002 § 471, 6 U.S.C. § 291 (abolishing the former Immigration and Naturalization Service); *id.* § 441, 6 U.S.C. § 251 (transferring immigration enforcement functions from the Department of Justice to the Department of Homeland Security); Immigration and Nationality Act § 103(a)(1), 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . . ").

residents of all 50 States and that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring an immediate federal response. Over the last four years, our southern border has been overrun. Last month, Border Patrol encountered 47,330 aliens along the southern border. While that number is a major reduction from the peak over the last four years, it is still too high. To demonstrate, in that month Border Patrol released at least 6,920 aliens at the southwest border, the vast majority of whom are subject to mandatory detention under 8 U.S.C. § 1225(b). In other months during the last four years, the numbers were astronomically higher. In December 2022, for example, Border Patrol released at least 140,306 aliens at the southwest border. Whether the number is 140,000 or 6,000, this is not the way our immigration laws are supposed to work. Aliens arriving at ports of entry or entering unlawfully are supposed to be inspected. 8 U.S.C. § 1225(a)(3), (b). Unless they are "clearly and beyond a doubt entitled to be admitted," they are supposed to be detained until either removed or they are granted discretionary relief such as asylum. 8 U.S.C. § 1225(b)(2)(A), (b)(1)(A)–(B).

This mandatory detention serves important public safety and national security purposes. Aliens who have not completed this process have not been effectively vetted for criminality or national security threats. Current databases do not allow for comprehensive and rapid searching for foreign convictions or other public safety and national security risks. As a result, the fact that the numbers at the border are effectively forcing DHS to engage in catch-and-release practices is eliminating or thwarting legally mandated screenings and it is threatening public safety and national security. This does not account for so-called gotaways, of which there have been millions over the last four years, who are not screened in any manner.

On the basis of these facts, I find that these circumstances endanger the lives, property,

2

safety, and welfare of the residents of every State in the Union. In fact, the only way to effectively prevent this danger to the States is to maintain operational control of the border, which Congress defined to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." 8 U.S.C. § 1701 note; *see also id.* (stating that the Secretary of DHS "shall take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States").

I also find, in concurrence with the President, that there is currently an influx of aliens arriving across our entire southern border, which requires a federal response. While 28 CFR § 65.81 identifies a variety of factors that "may be considered" in finding an influx, I find the most dispositive factor is "magnitude." The magnitude of the problem is alone sufficient to find an influx. The enumerated factors, however, further support this finding. First, if the influx is not controlled, it is likely to increase. I have seen again and again that failure to control the border increases the incentives for more aliens to attempt to enter unlawfully. Second, the introduction of unvetted foreign persons—at least some of whom will unquestionable be criminals—has a likelihood to increase criminal activity. Much of the illegal entries at our southern border involve other criminal conduct, including human trafficking, drug smuggling, and sexual assault. Third, law enforcement agencies, particularly immigration enforcement agencies, face unusual and overwhelming demands. In particular, immigration enforcement agencies currently face a shortage of detention capacity necessary to comply with the statutory detention obligations of 8 U.S.C. § 1225(b).

Accordingly, pursuant to the authorities under the Immigration and Nationality Act, 8 U.S.C. § 1101, *et sec.*, including the implementing regulations identified above, I find "that there

exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents" of all 50 States. I further find that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring an immediate federal response. I therefore request the assistance of State and local governments in all 50 States.

This finding is effective immediately. It expires in 60 days, unless extended.

Dated: 1-23-25

**Benjamine C. Huffman**

*Acting Secretary of Homeland Security.*

4

Exhibit B

**U.S. Department of Justice**
Immigration and Naturalization Service
Washington, DC 20536



# NEWS RELEASE

Contact: Media Services
Office of Public Affairs
(202)514-2648  Fax:(202)514-1776

October 19, 1998

## INS and Florida Sign Historic Agreement
## On Response to a Mass Migration

TALLAHASSEE, Fla. - U.S. Immigration and Naturalization Commissioner Doris Meissner and Florida Governor Lawton Chiles today signed the first agreement between the federal government and a state that provides for a joint response to a mass influx of aliens.

The Memorandum of Understanding (MOU) formalizes the terms under which Florida will support INS operations in response to an actual or imminent mass migration into the state. Under the MOU, Florida may provide logistical and law enforcement support to the federal response upon request by INS. INS, as the lead federal agency, will coordinate responsive law enforcement operations, and the state will be reimbursed for authorized expenses incurred. Implementation of the MOU is contingent upon action by the Attorney General to obligate funds from the Immigration Emergency Fund. The Attorney General also can approve the delegation of authority to state law enforcement officers to enforce immigration law during the mass migration.

A companion agreement outlining how state and local enforcement officers can help enforce federal immigration law has been drafted and will be executed with individual Florida law enforcement agencies following final implementing regulations that are expected to be published in the *Federal Register* later this year. INS has completed an initial draft of the implementing regulation that is under review at the Department of Justice. Under the terms of the draft companion agreement, Florida law enforcement officers would periodically receive immigration law training in preparation to help enforce immigration law under the direction of the INS only during an actual or imminent mass migration as determined by the Attorney General.

Meissner emphasized that INS is not aware of any information that indicates a mass migration event is imminent. She also noted that the Attorney General's ability to delegate federal authority in these situations is distinct from the Attorney General's authority to do so in cases not involving such an emergency.

"This MOU is the latest milestone in a continuing effort to improve coordination of the overall U.S. government response to mass migration events. It is an example of responsible government in action and demonstrates that contingency plans are in place to deal with such an emergency whenever it might occur," Meissner said. "This signing recognizes the work accomplished to date, ratifies the procedures for coordinated response operations, and reaffirms the commitment INS and the State of Florida have made to continue the process."

Meissner said the agreement "clearly shows that INS is continuing to carry out its responsibility as the lead federal agency in planning for and responding to any emergency created by a mass migration. I thank Governor Chiles and the State of Florida for their continuing support to the

planning process."

Chiles called the MOU a landmark agreement, and said he was pleased with the cooperation from INS and Commissioner Meissner. "Four years ago, I declared a state of emergency in South Florida," Chiles said. "Today, I'm declaring victory because the federal government will assume full responsibility for future mass migration response operations."

The MOU, the culmination of a two-year planning effort with the State of Florida, is a key element in the ongoing effort by the Department of Justice and INS to develop and implement a comprehensive federal response to any mass influx of aliens within the state. The effort has included the development of an operational plan to address mass migration events and a series of exercises designed to test the viability of that plan.

The largest of those exercises, which involved several hundred personnel from INS, the Coast Guard, the Public Health Service, and state and local authorities, was held in February of 1997 and clearly demonstrated that the federal government has increased its readiness and renewed its commitment to respond promptly to control mass illegal immigration into Florida. While U.S. policy to interdict migrants at sea and process them offshore remains unchanged, this plan provides a mechanism for apprehending and detaining those aliens who evade interdiction and arrive on our shores in violation of federal law.

Today's MOU is a significant step in formalizing and improving the planned federal response and ensuring cooperation with the State of Florida, but is by no means the end of the road. Subsequent planning efforts, to begin this fall, will address other joint INS and state concerns regarding mass migration issues. Under the terms of the MOU,

**INS is responsible for:**

- Functioning as the lead federal agency;
- Providing immigration law training to state and local law enforcement officers designated to enforce immigration law;
- Coordinating utilization of resources and personnel to support an operation; and
- Coordinating the reimbursement of the state and local governments for support provided at INS' request.

**In support of the federal operation, the state will:**

- Provide operational support, at its discretion, as requested by INS;
- Serve as a coordinator between its political subdivisions and INS;
- Provide law enforcement and logistics support, at its discretion, to the federal mass migration response operations as requested by INS; and
- Maintain law and order within the state.

- INS -

Exhibit C

## Memorandum of Understanding Between
## U.S. Customs and Border Protection and the Texas National Guard

This memorandum of understanding (the MOU) is entered into between U.S. Customs and Border Protection (CBP) and the Texas National Guard (Texas) to operationalize the Finding by the Acting Secretary of the Department of Homeland Security (DHS) on January 23, 2025, entitled, Finding of Mass Influx of Aliens (the Finding).

### I.    Authorities

This MOU is entered into by CBP pursuant to 8 U.S.C. §§ 1103(a)(10), 1357, 28 C.F.R. §§ 65.80–85, and DHS Delegation 7010.3.2.

This MOU is entered into by Texas pursuant to Article IV, Sections 7 and 10 of the Texas Constitution, Section 437.002 of the Texas Government Code, and Executive Order GA-54.

### II.    Purpose

The purpose of this MOU is to grant to Texas National Guard personnel, in a State Active Duty status, authority under Title 8 to exercise the duties and functions of an immigration officer as detailed herein. This authority shall be exercised only under the supervision and direction of CBP officials.

### III.    Definitions

Members of the Texas National Guard, in a State Active Duty status, are authorized by state law to serve as officers "executing state law as the public interest or safety requires" pursuant to Section 431.111 of the Texas Government Code, as further evidenced by Executive Order GA-41, and therefore qualify as "law enforcement officers" for purposes of this MOU under 8 U.S.C. § 1103(a)(10), authorized to assist CBP officials engaged in enforcing federal immigration laws pursuant to the duties described in 6 U.S.C. § 211(c).

1

## IV.    Effective date

This MOU is effective upon signature of both parties and expires when the Finding expires or when either party terminates the MOU. If either party notifies the other of an intent to terminate, all delegated Title 8 authority terminates immediately, except to the extent necessary to transfer custody of aliens to CBP who are in the custody of authorized Texas personnel. If the Finding is extended by the Secretary, or if the Secretary makes a similar Finding of an influx of aliens under 8 U.S.C. § 1103(a)(10) in the future, the parties may agree via email to extend or renew this MOU through the expiration of that Finding. To be a similar Finding, the Finding must cover all or part of Texas. CBP is responsible for notifying Texas by email of the entry, expiration, or extension of any such Finding.

## V.    Authorized immigration functions

a) Any Texas National Guard personnel, on State Active Duty, is authorized to perform the immigration functions specified below. The Texas National Guard will decide which officers may perform these functions and provide a written list of the names and titles of such officers to CBP, to be updated at regular intervals so that CBP has accurate information concerning the Texas officers operating under this MOU. Any CBP official who is supervising a Texas National Guard official may, at any time and for any reason, withdraw authorization for that official to exercise Title 8 authority.

b) The Title 8 authority specified below may be performed only under the supervision and direction of a CBP official. Any Texas National Guard personnel, on State Active Duty, performing Title 8 functions must have at least one CBP official embedded for the assigned mission. At all times, Texas National Guard personnel performing a Title 8 function must be able to speak to a CBP official, whether by cellular phone, radio, or other similar technology.

c) CBP may, in its discretion, designate CBP officials to provide supervision and direction to Texas National Guard personnel pursuant to this MOU. CBP will provide the names and titles of such CBP officials in writing to Texas.

d) The Secretary of Homeland Security has waived any applicable training requirements. But CBP may determine that authorized Texas National Guard personnel are capable of performing the duties listed herein or choose to provide training in its discretion.

2

e) Texas National Guard personnel acting pursuant to this MOU may exercise the authorities of immigration officers, as set forth in 8 U.S.C. § 1357, and as provided in 8 U.S.C. § 1103(a)(10), and perform or exercise any other powers, privileges, or duties conferred or imposed by applicable law or regulation on immigration officers. The immigration officer functions that Texas National Guard personnel may perform under these authorities include the following:

    i.    Investigating aliens for civil immigration violations to the same degree as a similarly situated CBP official may do so.

    ii.    Arresting aliens for civil immigration violations to the same degree as a similarly situated CBP official may do so.

    iii.    Transporting aliens to the same degree as similarly situated CBP official may do so, including transportation for the purposes of detention and transportation for the purposes of removal and/or repatriation.

f) At any time when Texas National Guard personnel, on State Active Duty, are acting under Title 8 authority, Texas National Guard personnel are subject to the same statutes, regulations, standards of conduct, and other policies as CBP officials. To the extent that Texas policies or standards are inconsistent with CBP policies or standards, Texas personnel acting under this MOU shall, where consistent with applicable law, adhere to CBP policies and standards in exercising Title 8 authority. Texas National Guard personnel should coordinate with CBP officials when inconsistencies cannot be resolved. The complaint and resolution procedures regarding allegations of misconduct by Texas National Guard personnel under this MOU shall be the same as for a CBP official, except to the extent that CBP decides to set up an alternative complaint and resolution procedure. CBP shall record and monitor any such complaints against Texas National Guard personnel. Any Texas National Guard personnel found to have engaged in misconduct under this MOU shall face appropriate disciplinary or other action as determined by the Texas National Guard.

g) CBP commits to work with the Department of Justice concerning the possible representation of Texas National Guard personnel acting under this MOU.

3

h) Texas National Guard personnel authorized under this MOU may be entitled to privileges, immunities, or defenses under state law for actions taken under color of state law outside the scope of this MOU. Texas National Guard personnel authorized under this MOU may be entitled to privileges, immunities, or defenses under federal law for actions taken under color of federal law within the scope of this MOU.

i) Texas National Guard shall cooperate fully in any federal investigation related to allegations of misconduct or wrongdoing resulting from Texas National Guard personnel performance of Title 8 functions and implementation of this agreement.

## VI.   Use of equipment

Unless otherwise determined by a relevant CBP official, Texas National Guard personnel will not utilize CBP equipment for purposes of this MOU. Texas National Guard personnel will use the same equipment issued for their State Active Duty responsibilities.

## VII.   Costs and reimbursement

a) The parties agree that Texas is responsible for all costs associated with this MOU. Texas may provide CBP access to Texas resources and property at Texas's discretion.

b) The parties agree that Texas may be responsible for liabilities that arise as a result of the implementation of this MOU, subject to Paragraphs V(g) and V(h).

c) Although CBP is not required to reimburse expenses, Texas will maintain records of operational expenditures incurred as a result of providing assistance under this MOU in the event CBP chooses to reimburse certain expenditures. *See, e.g.*, 28 C.F.R. §§ 65.80–65.85.

## VIII.   Media policy

The parties are free to share with the media the existence of this MOU. Specific responses to media requests and/or the release of documents must be coordinated with CBP and are subject to CBP's direction and control.

### IX. Amendment

Any amendments to this MOU must be in writing and signed by the parties or their delegees. An email agreement to amend this MOU will satisfy this provision.

### X. Miscellaneous

a) This MOU does not create any rights, benefits, or privileges for any third party.

b) This MOU does not abrogate or abridge any constitutional or civil rights protections.

By signing below, the parties agree to be bound by the terms of this MOU.

_____
Pete R. Flores
Acting Commissioner of CBP

_____
Greg Abbott
Governor of Texas

01-31-25
_____
Date

01/31/2025
_____
Date